IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 22-cr-313-RM

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1. JAREH SEBASTIAN DALKE,

    Defendant.

## GOVERNMENT'S MEMORANDUM IN SUPPORT OF DETENTION

The United States of America, by and through its attorneys, Cole Finegan, United States Attorney for the District of Colorado, Matthew G. Olsen, Assistant Attorney General for the National Security Division, and undersigned counsel, moves this Court, pursuant to 18 U.S.C. § 3142, to order the defendant's detention. Pretrial detention is appropriate in this case to ensure the appearance of the defendant at trial and the safety of the community. § 3142(f). A detention hearing has been set for Tuesday, October 11, 2022, before Magistrate Judge S. Kato Crews.

The defendant stands charged with attempted espionage, a serious national security offense. In August and September of this year, the defendant willfully passed Secret and Top Secret national defense information to an FBI online covert employee ("OCE"). The defendant believed that the OCE was associated with the Russian Federation ("Russia") and repeatedly expressed his support for Russia and its government. The defendant actively sought a long-term relationship with the OCE and asserted that he would exfiltrate additional classified information in the future. His motive appears to have been a mix of profit and ideology.

The maximum sentence for this offense is life in prison or, because two of the charged counts concern cryptographic information, death.[1]  *See* 18 U.S.C. § 794(a).  Given the defendant's prior access to exceptionally sensitive classified information as well as his background in cybersecurity and prior law enforcement training, the defendant poses an extraordinary risk of flight and danger to the community.  There is no combination of conditions that will reasonably assure his presence at future proceedings or the safety of the community.  This Court should order his detention.

## Analysis of the Statutory Factors

Each of the statutory factors weighs heavily in favor of the defendant's detention.  *See* 18 U.S.C. § 3142(g).  The government will address the factors in turn.

### 1. The Nature and Circumstances of the Offense

The indictment charges the defendant with six counts of attempting to transmit national defense information to a foreign government, all in violation of Section 794(a).  Because the defendant transmitted information classified at the Secret and Top Secret/Sensitive Compartmented Information ("SCI") levels, the defendant by definition created a risk of "serious" and "exceptionally grave damage" to the national security.  *See* Executive Order 13526 (2009) § 1(a).

The defendant's conduct was egregious and deliberate.  Abusing the trust and access afforded to him by the U.S. government, the defendant sought to enrich himself *and* assist Russia.  As the defendant explained to the OCE, "[t]here is an opportunity to help balance scales of the world while also tending to my own needs."

---

[1] The indictment does not include a special findings section setting forth the applicable statutory aggravating factors from 18 U.S.C. § 3592(b).  In the event the Attorney General authorizes a capital prosecution, the government would supersede the indictment.

The defendant began working for the National Security Agency ("NSA") on June 6, 2022. He held a Top Secret/SCI clearance and worked as an Information Systems Security Designer. The defendant's last day at the NSA was July 1, 2022. In this short time, the defendant undertook a deliberate and calculated effort to steal classified national defense information he knew would benefit Russia and harm the United States. Indeed, the defendant apparently sought employment from the NSA in order to betray his country. As he explained to the OCE, he applied for the job because he had "questioned our role in damage to the world in the past and by mixture of curiosity for secrets and a desire to cause change."

Less than one month later, on or about July 29, 2022, the defendant began communicating with the OCE via encrypted email. The defendant told the OCE that he had taken highly sensitive information relating to foreign targeting of U.S. systems and information on U.S. cyber operations, among other topics. The defendant falsely represented to the OCE that he was still employed by the U.S. government but said he was on a temporary assignment at a field location. The defendant explained that he was in financial need and requested compensation via a specific type of cryptocurrency in exchange for the information he possessed.

The defendant's emails to the OCE evince his belief that the OCE was associated with or employed by the Russian government. In one email to the OCE, the defendant claimed that he had reached out through "multiple published channels to gain a response. This included submission to the SVR TOR site."[2] The defendant requested that the OCE take steps to verify that he was truly associated with the Russian government. The defendant sought assurances that the OCE truly was a "Russian entity rather than americans [sic] trying to stifle a patriot." The defendant requested

---

[2] The SVR, or Foreign Intelligence Service, is the Russian government's external intelligence agency. TOR, short for "The Onion Router," is an open-source software that conceals an internet user's location and usage by directing Internet traffic through a relay network.

that the OCE provide verification of the association with Russia, through a posting on an official website or through a report in one of the "media services associated with the government."

To prove he had access to sensitive and valuable national defense information, on or about August 6, 2022, the defendant transmitted excerpts of three classified documents to the OCE. Each excerpt contained classification markings. One excerpt was classified at the Secret level, and two excerpts were classified at the Top Secret level. The first excerpt is the cover page and table of contents of a threat assessment of a foreign government's military offensive capabilities. The second excerpt relates to plans to update a certain cryptographic program. The third excerpt is a threat assessment of sensitive U.S. defense capabilities. These transmissions form Counts One through Three in the indictment.

In return for this information, the OCE provided cryptocurrency, which the defendant had previously requested, to an address the defendant provided. On or about August 26, 2022, the defendant requested $85,000 in return for what the defendant represented was all of information in his possession. The defendant also told the OCE that he would share additional information in the future, once he returned to the Washington, D.C. area. In fact, the defendant re-applied to the NSA in August 2022.

During the course of their communications, the OCE offered to establish a secure, digital connection that would allow the defendant to transfer the remaining materials in his possession. The OCE told the defendant that the digital connection would be in the Washington, D.C. area. The defendant, however, told the OCE that he was not in the D.C. area and that he did not want to disclose his current location for fear of the U.S. government being able to discern his identity.

On or about September 18, 2022, the defendant asked the OCE whether he would be able to set up the secure connection in Denver on September 28 or 29, 2022. The defendant falsely

represented that he was at a "field site" where he would be eligible to travel to Denver. In response, the OCE informed the defendant that the secure connection would be available at Union Station on September 28, 2022, between 11:30 a.m. and 3:30 p.m. The OCE provided the defendant with the instructions necessary to access the secure connection, including a network name, 20-digit security key, FTP address, username, and 20-digit password.

On September 28, 2022, the defendant arrived at Union Station in Denver, Colorado. Using his laptop computer and the instructions provided by the OCE, the defendant accessed the secure connection and transferred five documents, including more complete versions of the three documents from which the three excerpts the defendant previously transmitted were derived. These transmissions form Counts Four through Six of the indictment.

The defendant also transmitted a letter, which opened and closed in Russian Cyrillic characters. The opening of the letter translates to "my friends," and the close of the letter translates to "until we meet." The remainder, written in English, reads:

> I am very happy to finally provide this information to you. I thank you for your great efforts to accommodate this transfer. As I told my contact I must type the information as other methods are risky and cause questions to be asked of other people. If this happens I will not be able to share in the future. Please know the information is good. I am sure in some cases where your people already have information it can be verified.
>
> To make the process quicker I will only provide an overall classification at the start of the document and the author. I will not break down the classification of each section as these levels frequently change unless you require them in the future for some reason. I will also not include the sources or footnotes unless the desirable details are contained in them. I will also share the information that is discussed in images to the best of ability. These actions will allow you to be given a document that is searchable and able to be copied without extra pains, and also cuts down on some of the great time spent typing the copies for you.
>
> I look forward to our friendship and shared benefit. Please let me know if there are desired documents to find and I will try when I return to my main office. Until then when I return to my home office I will keep an eye out for documents that I think may be of interest to you.

The letter is signed with the initials the defendant used to sign his emails to the OCE. The FBI took the defendant into custody immediately after he completed the transmission. The FBI searched the defendant incident to his arrest and recovered a post-it note containing the instructions the OCE had provided to the defendant for accessing the secure connection, including the network name, security key, FTP address, username, and password.

The nature of the charged offense weighs heavily in favor of detention. Espionage is a serious offense that threatens the national security. The defendant's actions had the potential to jeopardize critical intelligence sources and methods. Congress recognized this by providing the maximum possible penalties, life imprisonment or death, for violations of the Espionage Act. The United States Sentencing Guidelines also treat this offense very seriously. Pursuant to Section 2M3.1(a)(1), where Top Secret information was gathered or transmitted, the Base Offense Level is 42, resulting in a sentencing range of 360 months to life in prison.

The nature and circumstances of the defendant's offense are further aggravated by his stated desire to assist Russia, a nuclear power currently engaged in an "unprovoked" and "unjustified" war against Ukraine, a key U.S. strategic ally. *See* Office of the Director of National Intelligence, Annual Threat Assessment of the U.S. Intelligence Community (Feb. 2022) at 10 ("We expect that Moscow will remain an influential power and a formidable challenge to the United States in the changing geopolitical landscape during the next decade"); *id.* at 11 ("We assess that Russia will remain the largest and most capable WMD rival to the United States for the foreseeable future . . . ."); U.S. Department of State-Bureau of Political Military Affairs, Fact Sheet-U.S. Security Cooperation with Ukraine (Oct. 4, 2022) ("The United States, our allies, and our partners worldwide are united in support of Ukraine in response to Russia's premeditated, unprovoked, and unjustified war against Ukraine.").

## 2. The Weight of the Evidence Against the Defendant

The evidence of the defendant's guilt is overwhelming. The elements of the offense are easily satisfied. Section 794(a) reads, in pertinent part:

> Whoever, **with intent or reason to believe that it is to be used to the injury of the United States or to the advantage of a foreign nation**, communicates, delivers, or transmits, or **attempts** to communicate, deliver, or transmit, to any foreign government . . . or **to any representative, officer, agent, employee, subject, or citizen** thereof, either directly or indirectly, **any document**, writing, code book, signal book, sketch, photograph, photographic negative, blueprint, plan, map, model, note, instrument, appliance, **or information relating to the national defense**, shall be punished. . . .

18 U.S.C. § 794(a) (emphasis added). The government will address each of the elements in turn.

### (1) That the defendant attempted to communicate, deliver, or transmit a document or information to a foreign government or representative, officer, agent, subject or citizen of a foreign government

The defendant is charged with transmitting six classified documents to the OCE. Between financial records which show that the defendant deposited payments from the OCE into his bank account and the fact that the FBI observed the defendant uploading documents to the secure network, there is no question as to the identity of the person who committed this offense.

The defendant clearly believed the OCE to be a representative of the Russian government. The defendant told the OCE that he had "attempted multiple published channels to gain a response. This included submission to the SVR Tor site." Later, when requesting confirmation of the OCE's affiliation, the defendant said, "I just want to be sure, as I think that you do, that you represent a Russian entity rather than americans trying to stifle a patriot." The defendant also requested that the OCE provide verification of the association with Russia, through a posting on an official website or through a report in one of the "media services associated with the government." Finally, in the letter he transmitted immediately prior to his arrest, the defendant wrote, "Please know the

7

information is good. I am sure in some cases where your people already have information it can be verified."

### (2) That such information related to the national defense of the United States (national defense information or "NDI")

The documents the defendant transmitted fall within the Espionage Act. The Espionage Act does not define "national defense information," and its meaning has therefore been developed by caselaw. The Supreme Court considered the term "information relating to the national defense" (as used in the Espionage Act of 1917, the predecessor to § 794) in *Gorin v. United States*, 312 U.S. 19 (1941). The Court defined it as "a generic concept of broad connotations, referring to the military and naval establishments and related activities of national preparedness." *Id.* at 28. The *Gorin* court undertook a careful review of the various versions of the statute considered by Congress, examining the purpose and intent of the drafters of the Act. *Id.* at 25-26.

Federal courts have consistently cited *Gorin* in their interpretations of the Espionage Act, including various subsections of 18 U.S.C. §§ 793 and 794. *See, e.g.*, *United States v. Squillacote*, 221 F.3d 542, 576-77 (4th Cir. 2000); *United States v. Morison*, 844 F.2d 1057, 1073 (4th Cir. 1988); *United States v. Dedeyan*, 584 F.2d 36, 40 (4th Cir. 1978); *United States v. Rosen*, 445 F. Supp. 2d 602, 620-22 (E.D. Va. 2006). Thus, courts do not limit the definition of NDI solely to information relating to active military campaigns or weapons capabilities. Courts examining the contours of NDI have found that the formal classification of information is one factor to consider in assessing whether the information at issue qualified as NDI. *Cf. Dedeyan*, 584 F.2d at 40 (upholding ruling below and quoting lower court's statement that the fact of classification tends "to show or make more probable that the document does, in fact relate to the national defense"). *See also United States v. Heine*, 151 F.2d 813, 816 (2d Cir. 1945) (Hand, J.) (dissemination of information never kept secret by the government could not support an espionage conviction).

information is good. I am sure in some cases where your people already have information it can be verified."

### (2) That such information related to the national defense of the United States (national defense information or "NDI")

The documents the defendant transmitted fall within the Espionage Act. The Espionage Act does not define "national defense information," and its meaning has therefore been developed by caselaw. The Supreme Court considered the term "information relating to the national defense" (as used in the Espionage Act of 1917, the predecessor to § 794) in *Gorin v. United States*, 312 U.S. 19 (1941). The Court defined it as "a generic concept of broad connotations, referring to the military and naval establishments and related activities of national preparedness." *Id.* at 28. The *Gorin* court undertook a careful review of the various versions of the statute considered by Congress, examining the purpose and intent of the drafters of the Act. *Id.* at 25-26.

Federal courts have consistently cited *Gorin* in their interpretations of the Espionage Act, including various subsections of 18 U.S.C. §§ 793 and 794. *See, e.g.*, *United States v. Squillacote*, 221 F.3d 542, 576-77 (4th Cir. 2000); *United States v. Morison*, 844 F.2d 1057, 1073 (4th Cir. 1988); *United States v. Dedeyan*, 584 F.2d 36, 40 (4th Cir. 1978); *United States v. Rosen*, 445 F. Supp. 2d 602, 620-22 (E.D. Va. 2006). Thus, courts do not limit the definition of NDI solely to information relating to active military campaigns or weapons capabilities. Courts examining the contours of NDI have found that the formal classification of information is one factor to consider in assessing whether the information at issue qualified as NDI. *Cf. Dedeyan*, 584 F.2d at 40 (upholding ruling below and quoting lower court's statement that the fact of classification tends "to show or make more probable that the document does, in fact relate to the national defense"). *See also United States v. Heine*, 151 F.2d 813, 816 (2d Cir. 1945) (Hand, J.) (dissemination of information never kept secret by the government could not support an espionage conviction).

In determining whether information constitutes NDI, courts further look to whether such information was "closely held" and could be potentially damaging to the United States if disclosed without authorization. *See, e.g.*, *Morison*, 844 F.2d at 1071-72 (upholding jury instruction below stating government must show (1) potential damage to the United States or usefulness to an enemy, and (2) that the information was "closely held" to meet burden on NDI element); *United States v. Rosen*, 599 F. Supp. 2d 690, 695 (E.D. Va. 2009) (national defense information "is that information which, as of the time of an alleged unauthorized disclosure, is found by the jury beyond a reasonable doubt (i) to have been closely held by the government and (ii) to be potentially damaging to the United States if disclosed without authorization.").

Here, the documents relate to, *inter alia*, a foreign military's offensive capabilities, sensitive U.S. defense capabilities, and plans to update a certain cryptographic program.[3] The documents were closely held, and their classifications are as noted in paragraphs 18 and 27 of the indictment. Given their classification, they were only available to persons with (1) an eligibility determination, or "clearance," (2) a nondisclosure agreement, and (3) a need to know. *See* Executive Order 13526 § 4.1 (Restrictions on Access). Original Classification Authorities reviewed the documents and confirmed that they were properly classified, meaning that their unauthorized disclosure had the potential to cause serious or, in the case of Top Secret information, exceptionally grave damage, to the national security. *See id.* § 1.2(a) (defining classification levels).

---

[3] Because this filing will be made on the public docket and counsel for the defendant do not yet have security clearances, the government is limited in how it can describe the documents. If the Court requires more details about the documents, the government respectfully requests the opportunity to provide that information under seal to prevent further harm to national security.

> **(3) That the defendant acted with intent or reason to believe that the information in question was to be used to the injury of the United States or to the advantage of a foreign nation.**

The defendant's communications with the OCE overwhelmingly demonstrate his intent to harm the United States and provide an advantage to a foreign nation.  In an early communication with the OCE, the defendant indicated that one of his motivations in reaching out was because he questioned the U.S. "role in damage to the world" and had a "desire to cause change."  The defendant also told the OCE that that he had "exfiltrated some information that is of a very high level."  He described the information he had access to as relating to foreign targeting of U.S. systems and information on cyber operations, among other topics.  As noted above, in the letter the defendant transmitted prior to his arrest, he wrote that "the information is good.  I am sure in some cases where your people already have information it can be verified."  The defendant even went as far, in his own words, to make the documents "searchable and able to be copied without extra pains."  In closing, the defendant remarked that he looked "forward to our friendship and shared benefit."  Believing that he would regain employment with the NSA, the defendant offered to "keep an eye out for documents that I think may be of interest to you."

> **(4) That the defendant acted willfully**

As a threshold matter, as a former NSA employee, the defendant signed several nondisclosure agreements in which he acknowledged that the unauthorized disclosure of protected information violates the law.  Likewise, prior to his separation from the NSA, the defendant acknowledged his lifelong obligation to safeguard the protected information to which he had access.  The defendant's conduct in this case flagrantly violates those agreements.

The defendant's communications with the OCE also demonstrate his willfulness.  When the defendant emailed the initial excerpts of the classified documents he had exfiltrated, he told the OCE he was providing them to demonstrate both his "legitimate access and willingness to

share" and further noted that the excerpts were just a "small sample to what is possible." The defendant stated he was "willing to provide full documents without reservation." The defendant's use of tradecraft, including anonymized and encrypted email as well as cryptocurrency, further show his awareness that his conduct is unlawful. The defendant's insistence on compensation and offer to "balance the scales" show that he is motivated by financial compensation, sympathy for Russia, and disloyalty to the United States, rather than altruistic or whistleblowing reasons.

### 3. The History and Characteristics of the Defendant

The defendant's history and characteristics show that he poses a significant risk of flight. The defendant claims to have substantial training and experience in the field of cybersecurity. According to the defendant's resume, he holds a bachelor's degree in cybersecurity and information assurance; a master's degree with a research focus on cyber policy and technical vulnerability analysis; and certifications as an information systems security professional and a certified cybercrime investigator. The defendant has served as a volunteer with the Colorado Rangers, a volunteer law enforcement reserve group. The defendant purports to be skilled in performing and supervising investigations that have a digital nexus, to include network intrusions, forensics, and information-system enabled fraud. The defendant's resume also states that he has training related to digital forensics and incident response, dark web investigations, open source intelligence, and advanced persistent threats. And the defendant was employed, albeit briefly, by the NSA, the nation's leading cybersecurity and signals intelligence agency. Finally, the defendant's use of an encrypted email account and refusal to travel to Washington, D.C., suggest a rudimentary understanding of tradecraft and law enforcement investigative techniques.

When the FBI executed a court-authorized search of the defendant's residence, agents located numerous fraudulent identification documents, cards, and badges. In many instances, there were multiple copies of the same fraudulent identification. Some of these identification cards

appeared to be virtually identical to the Personal Identity Verification ("PIV") cards used by federal government agencies. Most troubling, many of these fraudulent PIV cards falsely depicted the defendant as an employee or contractor of the NSA or *other U.S. intelligence agencies*. Some of the badges differ only slightly in size and minor detail from real badges used by the NSA. Given the large number of credentialed and badged agencies in the U.S. intelligence community, it is reasonable to believe that the defendant's fraudulent documents and badges would be taken at face value by local law enforcement agencies or ordinary civilians. It likewise would not be difficult to imagine that the defendant could attempt to procure or create a false passport or other documents to assist his flight from prosecution.

The defendant faces an indictment with six counts that each carry a potential life sentence. The defendant has no employment, and he and his wife appear to be in serious financial jeopardy. The defendant has a strong incentive to use his background and experience to avoid prosecution and flee the country. He has already demonstrated a willingness to undertake significant risks to enrich himself and harm the United States. Moreover, the defendant's betrayal of his sworn oath to protect and defend the United States shows an extreme disregard for the rule of law. The defendant's history and characteristics weigh in favor of detention.

4. **The Nature and Seriousness of the Danger to Any Person or the <u>Community That Would Be Posed By the Defendant's Release</u>**

The defendant presents a grave danger to the community. The defendant previously had access to classified U.S. government information, including Top Secret information whose unauthorized disclosure could "cause exceptionally grave damage to the national security." *See* Executive Order 13526 § 1.2(a)(1). Espionage is a unique crime in that it can be committed without arousing a great deal of suspicion. The defendant has transmitted – and could again transmit – highly classified information with a few keystrokes. Despite the government's diligent

efforts to recover the information the defendant exfiltrated, the defendant could have copies of the documents he tried to sell to Russia, or other classified information, hidden in unknown locations or accounts. Even with restrictions on the defendant's access to technology, he need merely meet face-to-face with an agent of a foreign government to pass the classified information he retains in his head. Or the defendant could use a willing third party to pass classified information on his behalf. Moreover, there are undoubtedly many foreign adversaries who would be happy to assist the defendant avoid prosecution in exchange for access to any classified information he may still possess or recall. The only way to mitigate this risk is to detain the defendant pending trial.

### **Response to the Defense's Arguments for Release Detention**

The defendant appears to concede that he is accused of a serious offense and therefore that he should only be released on the strictest of conditions. Doc. 13 at 8-9. The defendant claims that his background in the military and law enforcement weigh in his favor. *Id.* at 5-7. The evidence shows, however, that the defendant is no patriot. On the contrary, he quickly and without reservation betrayed the trust put in him by our country and the NSA to enrich himself and support a foreign adversary. The defendant's conduct shows disregard for the rule of law and his sworn oath to the United States.

The defendant does not cite a single case in which a defendant accused of violating Section 794(a) was released pending trial. This is likely because he was unable to find an analogous case in which a defendant was released.[4] The most recent similar case is *United States v. Rowe*, 21-cr-0474-GEKP-1 (E.D. Pa.). The indictment charges Rowe with transmitting a single document, classified at the Secret level, to an undercover agent in violation of Section 794(a). That court

---

[4] In the Eastern District of Virginia, a magistrate judge ordered a defendant's release, but the government successfully stayed the magistrate's ruling and appealed to the district court, who ordered the defendant's pretrial detention. *See United States v. Kevin Patrick Mallory*, 1:17-cr-00154-TSE (E.D. Va.).

ordered the defendant's detention pretrial. *See* Order of Detention, Docket No. 10, *United States v. Rowe*, 21-cr-0474-GEKP-1 (E.D. Pa. Mar. 1, 2022).

A cursory review of the cases the defendant cites shows they are inapposite. The defendants in *United States v. Gabrielian* are charged with sharing sensitive health information protected by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). Likewise, the defendants in *United States v. Histelberger* and *United States v. Bergersen* were charged with violations of Section 793. Histleberger was charged with retaining national defense information, and Bergersen was charged with transmitting it to a person not authorized to receive it. Section 793, however, is a less serious offense than Section 794. Section 793 does not require proof that the defendant transmitted the information to a foreign government or that the defendant acted with the intent or reason to believe the information would be used injure the United States or to advantage a foreign government. Accordingly, the statutory maximum sentence for a violation of Section 793 is only ten years.

## Conclusion

The government does not know with certainty how much classified information this defendant has stolen. The government also does not know what information he retains in his head. What the government does know is that the defendant was determined to help Russia, and that the information to which he had access would be valuable to many foreign governments. The defendant has no job and is facing six counts, each of which carries a potential life sentence. Finally, the defendant has a background in cybersecurity and an ability to create fraudulent identification documents. There is no combination of conditions that will reasonably assure the defendant's appearance and protect the safety of the community. This Court should order the defendant detained pending trial.

Respectfully submitted,

COLE FINEGAN
United States Attorney

By: *s/ Julia Martinez*  
Julia Martinez  
Assistant U.S. Attorney  
U.S. Attorney's Office  
1801 California St., Ste. 1600  
Denver, CO 80202  
Telephone: 303-454-0100  
E-mail: Julia.Martinez@usdoj.gov  
Attorney for Government

By: *s/ Jena Neuscheler*  
Jena Neuscheler  
Assistant U.S. Attorney  
U.S. Attorney's Office  
1801 California St., Ste. 1600  
Denver, CO 80202  
Telephone: 303-454-0100  
E-mail: Jena.Neuscheler@usdoj.gov  
Attorney for Government

MATTHEW G. OLSEN
Assistant Attorney General
National Security Division
U.S. Department of Justice

By: *s/ Christina Clark*  
Christina Clark  
Trial Attorney  
National Security Division  
Counterintelligence and Export Control Section  
950 Pennsylvania Avenue, NW  
Washington, DC 20530  
Telephone: (202) 514-2000  
E-mail: Christina.Clark3@usdoj.gov  
Attorney for Government

By: *s/ Adam L. Small*  
Adam L. Small  
Trial Attorney  
National Security Division  
Counterintelligence and Export Control Section  
950 Pennsylvania Avenue, NW  
Washington, DC 20530  
Telephone: (202) 514-2000  
E-mail: Adam.Small@usdoj.gov  
Attorney for Government

CERTIFICATE OF SERVICE

I hereby certify that on the 10th day of October 2022, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will send an electronic notification to all counsel of record.

                                             *s/ Julia Martinez*
                                             Julia Martinez
                                             Assistant U.S. Attorney
                                             U.S. Attorney's Office
                                             1801 California St., Ste. 1600
                                             Denver, CO 80202
                                             Telephone: 303-454-0100
                                             E-mail:  Julia.Martinez@usdoj.gov
                                             Attorney for Government