IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 1:22-cr-313-RM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.    JAREH SEBASTIAN DALKE,

      Defendant.

## PLEA AGREEMENT

The United States of America (the government), by and through Julia Martinez and Jena Neuscheler, Assistant United States Attorneys for the District of Colorado, and Christina Clark, Trial Attorney; and the defendant, Jareh Sebastian Dalke, personally and by counsel, David Kraut and Timothy P. O'Hara, submit the following Plea Agreement pursuant to D.C.COLO.LCrR 11.1. This agreement binds only the Criminal Division of the United States Attorney's Office for the District of Colorado and the defendant.

### I.   AGREEMENT

**A. Defendant's Plea of Guilty:**

The defendant agrees to

1)    Plead guilty to Counts 1 through 6 of the Indictment charging violations of 18 U.S.C. § 794(a), Attempt to Transmit National Defense Information to an Officer or Agent of a Foreign Government;

2)    Waive certain appellate and collateral attack rights, as explained in detail below;

3)    Cooperate as more fully described below;

4)    Not contest forfeiture as more fully described below;

Court Exhibit

1

5) Acknowledge his lifetime legal obligation to protect classified and national defense information as more fully described below;

6) Assign to the United States any profits or proceeds from publicity as more fully described below;

7) Refrain from contact with any foreign government or agents thereof as more fully described below; and

8) Waive certain rights to discovery, as explained in detail below.

**B. Government's Obligations:**

This agreement is made pursuant to Fed.R.Crim.P.11(c)(1)(A) and (B). The government agrees not to charge the defendant with further violations of the Espionage Act or with possession, receipt, or transportation of child pornography, based on information currently known to the government. Should the plea of guilty be vacated on the motion of the defendant, the government may, in its sole discretion, file such charges.

As further detailed below, if the government determines that the defendant has cooperated fully pursuant to this agreement and that the information the defendant has provided has been truthful, complete, accurate, and of value to the government, then the government will seek a sentence no greater than **262 months'** imprisonment.

The parties understand that this agreement is not binding on the Court.

Provided the defendant does not engage in prohibited conduct or otherwise implicate USSG §§ 3C1.1 and 3E1.1, cmt. n.4 between the guilty plea and sentencing in this case, the government agrees that the defendant should receive a two-level reduction for acceptance of responsibility pursuant to USSG § 3E1.1(a) and agrees to file a motion requesting that the defendant receive a one-level reduction for acceptance of responsibility pursuant to USSG § 3E1.1(b).

## C. Defendant's Waiver of Appeal:

The defendant is aware that 18 U.S.C. § 3742 affords the right to appeal the sentence, including the manner in which that sentence is determined. Understanding this, and in exchange for the concessions made by the government in this agreement, the defendant knowingly and voluntarily waives the right to appeal any matter in connection with this prosecution, conviction, or sentence (including the restitution order), unless it meets one of the following criteria:

1)   the sentence exceeds the maximum sentence provided in the statute of conviction, 18 U.S.C. § 794(a);

2)   the sentence exceeds the top end of the advisory guideline range from the Sentencing Guidelines that applies for the defendant's criminal history (as determined by the district court) at a total offense level of 41; or

3)   the government appeals the sentence imposed.

If the first criterion applies, the defendant may appeal only the issue of how his sentence exceeds the statutory maximum sentence. But if one of the latter two criteria apply, the defendant may appeal on any ground that is properly available in an appeal that follows a guilty plea.

The defendant also knowingly and voluntarily waives the right to challenge this prosecution, conviction, or sentence (including the restitution order) in any collateral attack (including, but not limited to, a motion brought under 28 U.S.C. § 2255). This waiver provision does not prevent the defendant from seeking relief otherwise available in a collateral attack on any of the following grounds:

1)   the defendant should receive the benefit of an explicitly retroactive change in the sentencing guidelines or sentencing statute;

2)   the defendant was deprived of the effective assistance of counsel; or

3)   the defendant was prejudiced by prosecutorial misconduct.

The Defendant also waives the right to appeal any sentence imposed below or within the Guideline range upon a revocation of supervised release in this case number, except where the defendant unsuccessfully objects to the grade of violation applied by the court during the district court revocation proceedings. In that event, this waiver does not apply and the defendant may appeal the sentence imposed upon a revocation of supervised release, even if that sentence falls below or within the guideline range calculated by the court.

The Defendant also waives the right to appeal the denial of any motion filed under 18 U.S.C. § 3582(c)(1)(A) where such denial rests in any part upon the court's determination that a sentence reduction is not warranted under the factors set forth in 18 U.S.C. § 3553(a). This waiver does not apply to an appeal of a denied § 3582(c)(1)(A)(i) motion where the district court, in denying the motion on § 3553(a) grounds, failed to consider the facts allegedly establishing extraordinary and compelling circumstances as part of its § 3553(a) analysis.

#### D. Defendant's Cooperation:

The defendant agrees to provide truthful, complete, and accurate information relating to any matter about which the defendant may possess knowledge, information, or materials being investigated by the government, and agrees to cooperate fully with the government. Lies, deliberate falsehoods, or misleading information provided during the cooperation with the government are grounds for rescission of this plea agreement as well as possible further prosecution for perjury or false statements. This cooperation may include, but is not limited to, the following:

1) The defendant agrees to be fully debriefed, and to attend all meetings at which his presence is requested, concerning his participation in and

knowledge of all criminal activities.

2)      The defendant agrees to affirmatively furnish to the government all documents and other material that may be relevant and that are in the defendant's possession or control.

3)      The defendant agrees to testify fully and truthfully at any proceeding in the District of Colorado or elsewhere as requested by the government.

4)      The defendant agrees to at all times give complete, truthful, and accurate information and testimony and to fully and truthfully disclose all information with respect to the activities of the defendant and others concerning all matters about which the government inquires.

5)      The defendant consents to postponements of his sentencing, as requested by the government and as approved by the Court. Should the defendant be required to provide testimony at a time subsequent to his sentencing in this case and should the defendant fail, at a later date, to comply with the obligation to testify, the government could seek to recharge him on any and all counts which were dismissed as part of this plea agreement.

6)      The defendant agrees he will not violate federal, state, or local law while awaiting sentencing in this case. The government may consider any such violations a material breach of his agreement to cooperate with the government.

The government agrees that any information and testimony given by the defendant pursuant to his cooperation will not be used directly against the defendant in any criminal case except for prosecutions for perjury, making a false statement, obstruction of justice, or for impeachment.   Any information and testimony relating to the defendant's involvement in crimes of violence, as defined in Title 18, United States Code, Section 16, is excluded from this agreement.

The defendant agrees that if the government can show that the defendant lied, made deliberate falsehoods, or intentionally provided misleading information to the government or law enforcement authorities, or if the defendant does not fulfill the terms of or does not complete the cooperation as required under this agreement, then any information or testimony which the defendant has provided in connection with the above

Page 5 of 25

referenced cooperation can be used in any prosecution against the defendant. If the government alleges such conduct, it will have the burden of establishing the alleged conduct at a separate hearing by a preponderance of the evidence.

The parties understand and agree that the government's determination of whether the defendant has cooperated fully pursuant to this agreement, as well as the government's assessment of the value, truthfulness, completeness, and accuracy of the cooperation, are within the government's sole discretion. The parties understand and agree that the defendant shall not be entitled to withdraw his plea if the government determines that the defendant has not fully cooperated, nor shall the defendant be entitled to withdraw his plea if he disagrees with the government's assessment of his cooperation.

If the government determines that the defendant has cooperated fully pursuant to this agreement and that the information the defendant has provided has been truthful, complete, accurate, and of value to the government, the government will seek a sentence no greater than **262 months'** imprisonment.  The parties understand and agree that the defendant's cooperation does not relate to the investigation or prosecution of another person who has committed an offense.  The government will set forth the nature and extent of the defendant's cooperation in a motion for a departure or variance, or other sentencing pleading.

### E. Forfeiture and Abandonment of Property

The defendant admits the forfeiture allegations. The defendant further agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 18 U.S.C. § 794(d), whether in the

possession or control of the United States, the defendant, the defendant's nominees, or elsewhere.

The defendant further agrees that the below-described property, which was seized from the defendant for evidentiary purposes, and which is currently in the custody or control of the Federal Bureau of Investigation (FBI), was lawfully seized and that it was used, or intended to be used, to commit, or to facilitate the commission of, the offenses to which the defendant is pleading guilty, and/or is evidence, contraband, or fruits of the crimes to which the defendant is pleading guilty. The defendant, as sole and rightful owner, relinquishes and abandons all claims, title, and interest the defendant has in such property with the understanding and consent that FBI may dispose of the property without further obligations.

The assets to be forfeited and abandoned specifically include, but are not limited to, (1) the proceeds obtained by the defendant and (2) all papers, digital media, electronic devices, and other items seized from the defendant's residence, vehicle, and person on or about September 28, 2022, and August 22, 2023. The defendant agrees and consents to the forfeiture of these assets pursuant to any federal criminal, civil, and/or administrative forfeiture action. The defendant understands that pursuant to 18 U.S.C. § 983, the seizing agency is required to send notice in non-judicial civil forfeiture matters. Having been advised of said rights regarding notice, the defendant hereby knowingly and voluntarily waives his rights to notice being sent within the time frames in 18 U.S.C. § 983 and to having the property returned to him if notice is not sent within the prescribed time frames. The defendant further agrees to the forfeiture of any substitute assets up to the

value of any property described above pursuant to 21 U.S.C. § 853(p) and Federal Rules of Criminal Procedure 32.2(e).

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty this Court may impose upon the defendant in addition to forfeiture.

### F. Lifetime Obligation to Protect Classified and National Defense Information

The defendant acknowledges that, in connection with his employment by the National Security Agency (NSA), he entered into certain agreements proscribing the unauthorized disclosure of protected information, including classified information, intelligence and intelligence-related information, and other information acquired as part of the defendant's performance of his official duties. The defendant acknowledges his continuing duties and obligations under these agreements, and they are hereby incorporated by reference.

The defendant understands and agrees that he has a continuing legal obligation to refrain from the unauthorized oral or written disclosure of classified information, or information relating to the national defense. The defendant understands and agrees that the law forbids him from disclosing, communicating, transmitting, or disseminating any classified information, or information relating to the national defense, without regard to where, when, or how he learned of or came into possession of the classified information or information relating to the national defense. The defendant understands and agrees that merely because classified information, or information relating to the national defense, may have appeared publicly does not render that information unclassified.

### G. Assignment of Any Profits or Proceeds from Publicity

The defendant hereby assigns to the United States any profits or proceeds which he may be entitled to receive in connection with any publication or dissemination of information relating to his work at NSA, his unlawful activities, the facts and circumstances leading to his apprehension and conviction, or acquired from NSA files, and agrees that any such profits and/or proceeds constitute the proceeds of his unlawful activity for purposes of 18 U.S.C. § 794(d)(1)(A). This assignment shall include all profits and proceeds for the benefit of the defendant, regardless of whether such profits and proceeds are payable to himself or to others, directly or indirectly, for his benefit or for the benefit of the defendant's associates or a current or future member of the defendant's family. The defendant shall not circumvent this assignment by assigning the rights to his story to an associate or to a current or future member of the defendant's family, or to another person or entity who would provide some financial benefit to the defendant, to the defendant's associates, or to a current or future member of the defendant's family. Moreover, the defendant shall not circumvent this assignment by communicating with an associate or a family member for the purpose of assisting or facilitating their profiting from a public dissemination, whether such an associate or other family member is personally or directly involved in such dissemination.

Should the defendant at any time author or participate in the creation of any book, writing, article, film, documentary, or other production, or otherwise provide information for purposes of publication or dissemination, including but not limited to information provided through interviews with writers or representatives of any media organization or entity, the defendant hereby agrees first to submit in a timely fashion such book, writing,

article, film, documentary, other production, or information to the NSA and the FBI for timely pre-publication review and deletion of information which, in the discretion of the NSA and the FBI, should not be published or disseminated on the grounds of national security or the defendant's pre-existing agreements with the NSA.

## H. No Foreign Agent Contacts

The defendant understands and agrees that he shall not knowingly have contact with any foreign government or agents thereof, except with the express permission of the FBI. The defendant understands and agrees that he shall not seek or knowingly accept, personally or through another person or entity, any benefit from such foreign government or agent thereof, and should such a benefit be received by the defendant, or some other person or entity on his behalf, he hereby assigns any such benefit to the United States. For purposes of this paragraph, any benefit provided to an associate of the defendant or to a current or future family member of the defendant, which is related to, arises out of, or is in recognition of, the defendant's unlawful activities, is a benefit deemed provided to the defendant himself.

## I. Waiver of Discovery

As part of this plea agreement, and based upon the concessions of the United States in this plea agreement, the defendant knowingly, willingly, and voluntarily gives up the right to seek any additional discovery. Further, the defendant knowingly, willingly, and voluntarily waives all pending requests for discovery. This waiver, however, shall not apply to any discovery that negates the defendant's guilt.

## II.    ELEMENTS OF THE OFFENSES

The parties agree that the elements of Attempting to Transmit National Defense

Information to An Officer or Agent of a Foreign Government, in violation of 18 U.S.C. §

794(a), and as charged in Counts One through Six of the Indictment are as follows:

(1)  the defendant attempted to transmit information to a foreign government or agent thereof;

(2) the information related to the national defense;

(3) the defendant had intent or reason to believe that the information was to be used to injure the United States or benefit a foreign nation; and

(4) the defendant attempted to transmit the information willfully.[1]

## III.    STATUTORY MAXIMUM SENTENCE

The maximum sentence for a violation of Counts One through Six of the Indictment

is: not more than life imprisonment; a maximum term of supervised release of five years;

and a $100 mandatory victim's fund assessment fee.

## IV.    COLLATERAL CONSEQUENCES

The defendant understands his conviction may cause the loss of civil rights,

including, but not limited to, the rights to possess firearms, vote, hold elected office, and

sit on a jury.

The defendant understands the potential consequences of this conviction set forth

in 5 U.S.C. § 8312.

---

[1] The Tenth Circuit does not have a model jury instruction for this offense. The foregoing elements were adapted from instructions affirmed by the Fourth Circuit in United States v. Mallory, 40 F.4th 166 (4th Cir. 2022).

### V.   STIPULATION OF FACTS

The factual basis for this plea is set forth below. Because the Court must, as part of its sentencing methodology, compute the advisory guideline range for the offense of conviction, consider relevant conduct, and consider the other factors set forth in 18 U.S.C. § 3553, additional facts may be included below which are pertinent to those considerations and computations. To the extent the parties disagree about the facts set forth below, the stipulation of facts identifies which facts are known to be in dispute at the time of the execution of the plea agreement.

This stipulation of facts does not preclude either party from presenting non-contradictory additional facts which are relevant to the Court's guideline computation, to other 18 U.S.C. § 3553 factors, or to the Court's overall sentencing decision.

The parties stipulate that the following facts are true and correct.

#### Background on Classified Information

Under Executive Order 13526, information in any form may be classified if it: (1) is owned by, produced by or for, or is under the control of the United States Government; (2) falls within one or more of the categories set forth in the Executive Order [Top Secret, Secret, and Confidential]; and (3) is classified by an original classification authority who determines that its unauthorized disclosure reasonably could be expected to result in damage to the national security.

Where such unauthorized disclosure could reasonably result in damage to the national security, the information may be classified as "Confidential" and must be properly safeguarded. Where such unauthorized disclosure could reasonably result in serious damage to the national security, the information may be classified as "Secret" and must

be properly safeguarded.  Where such unauthorized disclosure could reasonably result in exceptionally grave damage to the national security, the information may be classified as "Top Secret" and must be properly safeguarded.

Sensitive Compartmented Information ("SCI") means classified information concerning or derived from intelligence sources, methods, or analytical processes, which is required to be handled within formal access control systems.

Classified information of any designation may be shared only with persons determined by an appropriate United States Government official to be eligible for access, and who possess a "need to know."  Among other requirements, in order for a person to obtain a security clearance allowing that person access to classified United States Government information, that person is required to and must agree to properly protect classified information by not disclosing such information to persons not entitled to receive it, by not unlawfully removing classified information from authorized storage facilities, and by not storing classified information in unauthorized locations.  If a person is not eligible to receive classified information, classified information may not be disclosed to that person.  In order for a foreign government to receive access to classified information, the originating United States agency must determine that such release is appropriate.

Pursuant to Executive Order 13526, classified information contained on automated information systems, including networks and telecommunications systems, that collect, create, communicate, compute, disseminate, process, or store classified information must be maintained in a manner that: (1) prevents access by unauthorized persons; and (2) ensures the integrity of the information.

32 C.F.R. Parts 2001 and 2003 regulate the handling of classified information. Specifically, 32 C.F.R. § 2001.43, titled "Storage," regulates the physical protection of classified information. This section prescribes that Secret and Top Secret information "shall be stored in a GSA-approved security container, a vault built to Federal Standard (FHD STD) 832, or an open storage area constructed in accordance with § 2001.53." It also requires periodic inspection of the container and the use of an Intrusion Detection System, among other things.

DALKE's Background

The defendant, Jareh Sebastian DALKE (DALKE), is a U.S. citizen. Prior to his arrest, he resided in Colorado Springs, Colorado. DALKE obtained a B.S. in Cybersecurity and Information Assurance from Western Governor's University in 2019. From 2015 to 2018, DALKE was a member of the U.S. Army. DALKE served as an E-3 Private First Class, Military Occupational Specialty 68W Health Care Specialist, and held a Secret security clearance, which he received in 2016. DALKE has also served as a volunteer with the Colorado Rangers, a volunteer law enforcement reserve group, which supports law enforcement agencies throughout Colorado.

Beginning on June 6, 2022, DALKE became a civilian employee of the National Security Agency (NSA), where he served from June 6, 2022, to July 1, 2022. During this time, DALKE's job title was Information Systems Security Designer, and he was assigned to an NSA facility in Maryland. As required for his assignment at the NSA, DALKE held a Top Secret security clearance, which took effect upon his entry on duty to the NSA in June 2022. To acquire his security clearance, DALKE signed a lifetime binding non-disclosure agreement. In that agreement, DALKE acknowledged that "all protected

information to which I may obtain access hereafter, is and will remain the property of the United States Government unless and until otherwise determined by an appropriate official or final ruling of a court of law." DALKE also acknowledged that the "failure to return such materials may be a violation of Section 793 of Title 18, United States Code." DALKE further acknowledged that "the unauthorized disclosure of protected information may invoke the criminal sanctions prescribed by one of more of the following statutes Sections 793, 794, 798, 952, and 1924 of Title 18."

In addition to DALKE's Top Secret clearance, he maintained sensitive compartmented access (SCI) to other highly classified programs. In his indoctrination memoranda, DALKE acknowledged that "THE NEED FOR SPECIAL PROTECTION OF THIS MATERIAL WAS MADE KNOWN TO ME, AND I WAS REMINDED THAT ACCESS TO THIS MATERIAL IS GOVERNED BY THE TERMS OF THE NSA SECURITY AGREEMENT THAT I HAVE PREVIOUSLY SIGNED." (Capitalization in original.)

While at the NSA, DALKE also received training on his duty to protect classified materials from unauthorized disclosure, which included complying with handling, transportation, and storage requirements. In particular, DALKE was advised that the unauthorized disclosure of Top Secret information reasonably could be expected to cause exceptionally grave damage to the national security of the United States and that a violation of the rules governing the handling of classified information could result in criminal prosecution.

Shortly after he began working at the NSA, DALKE requested a 9-month leave of absence to help a family member with a medical condition. On June 28, 2022, after his extended leave request was denied, DALKE submitted his resignation to the NSA. On

July 1, 2022, DALKE also signed a termination statement in which he agreed that, "even though my authorized access to NSA is hereby terminated, I continue to be obligated . . . to preserve and safeguard the security of protected information." DALKE also acknowledged that he was required to return "to the government all protected information to which I may have obtained access during the course of my employment or other service with the NSA."

DALKE subsequently re-applied for employment with the NSA. He accepted a new position, assigned to the same NSA facility in Maryland, on or about September 28, 2022.

### DALKE Communicated with an FBI OCE, Whom He Believed to Be an Agent of the Russian Federation

On July 29, 2022, using an email account created for this purpose, a Federal Bureau of Investigation (FBI) Online Covert Employee (OCE) sent an email to Email Account-1. Email Account-1 was hosted by a particular Foreign Email Provider which offers its users a combination of public-key cryptography and symmetric encryption protocols to provide end-to-end encryption, meaning that only the sender and intended recipient can read the email messages in plain text. In this email, the OCE stated, in sum and substance, that he had been informed that he should reach out to Email Account-1 to discuss items of mutual benefit.

Email Account-1 belonged to DALKE, and DALKE had sole and exclusive use of Email Account-1 at all times relevant to the charges to which DALKE is pleading guilty. DALKE was located in the State and District of Colorado during all of his communications with the OCE.

DALKE responded to the OCE on or about August 1, 2022, and requested that their communications continue through the Foreign Email Provider. Two days later, in response, the OCE agreed and asked, "What do you propose?"

DALKE responded the same day. He stated that he was an employee of the U.S. government and that he put in for the position he was currently in because he had "questioned our role in damage to the world in the past and by mixture of curiosity for secrets and a desire to cause change." DALKE told the OCE that he had "exfiltrated some information that is of a very high level." DALKE added that he was on a temporary assignment that did not allow him current access to such information, but explained that he planned to return to a position that would give him access to information originating from both the NSA and another U.S. government agency. DALKE described the information he had access to as relating to foreign targeting of U.S. systems and information on cyber operations, among other topics.

DALKE further noted that he was in financial need and was seeking compensation via a specific type of cryptocurrency in return for providing information he had procured, stating, "[t]here is an opportunity to help balance scales of the world while also tending to my own needs." DALKE requested payment in the specific type of cryptocurrency because "as in these things privacy is extremely important."

Throughout their communications, the OCE implied, and DALKE believed, that the OCE was an agent of the Russian Federation (Russia).

On or about August 5, 2022, the OCE thanked DALKE and asked him for proof of access in order to determine proper compensation.

<u>DALKE Emailed National Defense Information to the OCE</u>

On or about August 6, 2022, DALKE emailed excerpts ("Excerpt 1," "Excerpt 2," and "Excerpt 3") of three classified documents ("Classified Document 1," "Classified Document 2," and "Classified Document 3") to the OCE. All three of the documents from which the excerpts were taken are classified as Top Secret//SCI and contain National Defense Information. In addition, the excerpts themselves each contain classified National Defense Information. DALKE stated that he was providing the excerpts to demonstrate both his "legitimate access and willingness to share," and further noted that the excerpts were just a "small sample to what is possible."

Classified Document 1 is a 22-page threat assessment of Foreign Government-1's military offensive capabilities. DALKE accessed and printed Classified Document 1 on or about June 17, 2022, during his employment with NSA. Excerpt 1 is the cover page and table of contents of Classified Document 1.

Classified Document 2 is a 31-page document containing information regarding plans to update a certain cryptographic program. DALKE accessed and printed Classified Document 2 on or about June 22, 2022, during his employment with NSA. Excerpt 2 is four pages of Classified Document 2.

Classified Document 3 is a 40-page document containing information related to sensitive U.S. defense capabilities, a portion of which relates to Foreign Government-1. DALKE accessed and printed Classified Document 2 on or about June 22, 2022, during his employment with NSA. Excerpt 3 is two pages of Classified Document 3.

DALKE willfully transmitted Excerpt 1, Excerpt 2, and Excerpt 3 to the OCE with the intent and reason to believe that the information contained therein would be used to injure the United States and to benefit a foreign nation, namely Russia.

Using a cryptocurrency address DALKE provided to the OCE, on or about August 24, 2022, August 25, 2022, September 2, 2022, and September 5, 2022, the OCE deposited cryptocurrency worth approximately $16,499.04 USD in DALKE's account. DALKE confirmed receipt of each transfer.

On or about August 26, 2022, DALKE transferred the first two deposits of cryptocurrency to a cryptocurrency exchange account that he had established for himself. Three days later, DALKE transferred those funds into his bank account. The third and fourth deposits remained in DALKE's cryptocurrency account until they were seized by the FBI, after DALKE's arrest.

DALKE Transmitted National Defense Information Via a Dead Drop at Union Station

On or about August 26, 2022, DALKE told the OCE that he had a total debt of $237,000, $93,000 of which was "coming due very soon." Accordingly, DALKE requested $85,000 in return for all the information currently in his possession. DALKE said he would be "happy to chip away at the amount that remains with additional future information shared to you."

The OCE informed DALKE that the OCE had established a secure, digital connection that would allow DALKE to transfer the remaining materials in his possession. The OCE told DALKE that the digital connection would be in the Washington, D.C. area. DALKE, however, told the OCE that he was not in the Washington, D.C. area and that he

did not want to disclose his current location for fear of the NSA being able to discern his identity.

On or about September 18, 2022, DALKE, who had never disclosed his location to the OCE, asked the OCE whether the OCE would be able to set up the secure connection in Denver, Colorado, on September 28 or 29, 2022. DALKE told the OCE, "If the Americans ever get this information I am afraid it will make obvious who has shared this information, but if you can get approval for this last accommodation I am sure I can get you the documents quickly." DALKE added that, in the future, he would "be back in Washington and will not need special arrangements again."

On or about September 19, 2022, the OCE told DALKE to be prepared to be in Denver on September 28 or 29, as DALKE had requested, and that additional instructions would follow. On or about September 20, 2022, DALKE sent an email to the OCE confirming that he would be available on the stated days and that he would "wait to receive the transfer information when available." DALKE added, "I look forward to finally get [sic] you this information and the benefit it will bring. I am glad this arrangement was possible."

On or about September 23, 2022, the OCE informed DALKE that a secure digital connection would be available for a period of four hours on September 28, 2022. The OCE told DALKE to stand by for the specific location. On or about September 26, 2022, the OCE provided the unique information DALKE would need to access the secure connection and told DALKE the secure connection would be available at Union Station in downtown Denver, Colorado, on September 28, 2022, between 11:30 a.m. and 3:30 p.m., during which time DALKE could complete the transmission.

On or about September 28, 2022, after accepting the offer of re-employment from

the NSA, DALKE departed from his home in Colorado Springs, Colorado, and drove to Denver, Colorado. DALKE left his cell phone at home and had disabled a location-enabled system on his vehicle, in an effort to remain anonymous and avoid law enforcement detection. DALKE parked several blocks away and entered Union Station on foot. Using a laptop computer and the instructions provided by the OCE, DALKE accessed the secure connection and transferred five (5) files, which he named simply "1," "2," "3," "4," and "5."

File "1" is a letter which begins with "My friends!" written in Russian in Cyrillic characters, and states, in part:

> I am very happy to finally provide this information to you. I thank you for your great efforts to accommodate this transfer.
> . . .
> I look forward to our friendship and shared benefit. Please let me know if there are desired documents to find and I will try when I return to my main office.

File "2" is a 10-page retyped version of Classified Document 1. File "3" is a 28-page retyped version of Classified Document 3.[2] File "4" is a 12-page retyped version of Classified Document 2. File "5" is a scanned copy of an annex, which is part of Classified Document 2. Files "2," "3," "4," and "5" all contain Top Secret National Defense Information.

DALKE willfully transmitted files "2," "3," "4," and "5," to the OCE with the intent and reason to believe the information contained therein would be used to injure the United States and to benefit a foreign nation, namely Russia.

---

[2] Paragraph 27 of the General Allegations in the Indictment contains scrivener's errors with respect to the page counts of these documents.

FBI agents arrested DALKE at Union Station moments after he transmitted the files. The FBI also executed search warrants on DALKE's residence, person, and vehicle, and seized various items of evidence, including numerous electronic devices. From DALKE's person, agents recovered, among other items: a firearm, a post-it note containing handwritten instructions matching those provided by the OCE for accessing the secure connection, an SD card, and the laptop DALKE utilized to transmit the files. From DALKE's home, agents recovered, among other items, a network-attached storage (NAS) device, which DALKE used to back up data from other electronic devices. Investigating agents located scanned copies of Classified Documents 1, 2, and 3 on the NAS, and located files "1," "2," "3," "4," and "5" on both the SD card and laptop seized from DALKE's person.

## VI.    ADVISORY GUIDELINE CALCULATION

The parties understand that the imposition of a sentence in this matter is governed by 18 U.S.C. § 3553. In determining the particular sentence to be imposed, the Court is required to consider seven factors. One of those factors is the sentencing range computed by the Court under advisory guidelines issued by the United States Sentencing Commission. In order to aid the Court in this regard, the parties set forth below their estimate of the advisory guideline range called for by the United States Sentencing Guidelines. To the extent that the parties disagree about the guideline computations, the recitation below identifies the matters which are in dispute.

The Guideline calculation below is the good-faith estimate of the parties, but it is only an estimate. The parties understand that the government has an independent obligation to assist the Court in making an accurate determination of the correct guideline

range.  To that end, the government may argue that facts identified in the presentence report, or otherwise identified during the sentencing process, affect the estimate below. The parties further understand and agree that the government's agreement to seek a sentence no greater than 262 months, as detailed in Section I.D of this plea agreement, will not change if the Court calculates a guideline range lower than the government's estimate below.

a)   Under Section 2M3.1, the base offense level is **42**.

b)   The government submits that two levels (**+2**) are added because the defendant abused a position of public trust in a manner that significantly facilitated the commission of the offense.  § 3B1.3.

**The defendant reserves the right to contest the application of § 3B1.3.**

c)   The adjusted offense level is **44**, or **42** if § 3B1.3 does not apply.

d)   Three levels (**-3**) are subtracted because the defendant clearly demonstrated acceptance of responsibility by timely pleading guilty. § 3E1.1.  The resulting total offense level is **41**, or **39** if § 3B1.3 does not apply.

e)   The parties understand that the defendant's criminal history computation is tentative and based on the defendant's prior convictions.  The parties believe the defendant is in criminal history category I.

f)   The career offender/criminal livelihood/armed career criminal adjustments do not apply.

g)   The advisory guideline range resulting from these calculations is **324-405 months** at offense level 41, or **262-237 months** at offense level 39.  However, in order to be as accurate as possible, with the criminal history category undetermined at this time, an offense level of 41 could conceivably result in a range from 324 months (bottom of Category I) to life (top of Category VI).  An offense level of 39 could conceivably result in a range from 262 months (bottom of Category I) to life (top of Category VI).  The guideline range would not exceed, in any case, the cumulative statutory maximums applicable to the counts of conviction.

h)   Pursuant to guideline § 5E1.2, assuming the estimated offense level above is correct, the fine range for this offense would be $ 50,000 to $ 500,000, plus applicable interest and penalties.

i)   Pursuant to guideline § 5D1.2, if the Court imposes a term of supervised release, that term would be at least two years, but not more than five years.

The parties understand that the Court is free, upon consideration and proper application of all 18 U.S.C. § 3553 factors, to impose that reasonable sentence which it deems appropriate in the exercise of its discretion and that such sentence may be less than that called for by the advisory guidelines (in length or form), within the advisory guideline range, or above the advisory guideline range up to and including imprisonment for the statutory maximum term, regardless of any computation or position of any party on any 18 U.S.C. § 3553 factor.

## VII.   ENTIRE AGREEMENT

The agreement disclosed to the Court is the entire agreement. There are no other promises, agreements or "side agreements," terms, conditions, understandings, or assurances, express or implied. In entering this agreement, neither the government nor the defendant has relied, or is relying, on any other terms, promises, conditions or assurances.

Date:   10/23/2023

Jaren Sebastian Dalke
Defendant

Date:   10/23/23

David Kraut
Attorney for Defendant

Date: 10/23/23

Timothy P. O'Hara
Attorney for Defendant

Date: 10/23/23

Julia Martinez
Assistant U.S. Attorney

Date: 10/23/23

Jena Neuscheler
Assistant U.S. Attorney

Date: 10/23/23

Christina Clark
Trial Attorney